James Henry KENT, Plaintiff,

v.

PITTSBURGH PRESS COMPANY, a corporation, and Jack Grochot, an individual, Defendants.

Civ. A. No. 71–1077.

United States District Court, W. D. Pennsylvania.

Aug. 14, 1972.

Harry Alan Sherman, Pittsburgh, Pa., for plaintiff.

Edmund S. Ruffin, III, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is an action for libel and invasion of privacy. The plaintiff is James Henry Kent, an ex-convict. The defendants are the Pittsburgh Press Company, which publishes The Pittsburgh Press, a daily newspaper of general circulation in metropolitan Pittsburgh, Pennsylvania, and Jack Grochot, a writer employed by the Press. Presently pending is the defendants' Motion for Summary Judgment.

The article which forms the basis of this action was written by Grochot and published by the Press. It appeared in the Press on Sunday, December 13, 1970.[1] It was one of a series of articles written by Grochot and published by the Press dealing with the subject of local prison conditions and prison reform. The four-part series, of which the December 13 article was the first, was entitled "Behind The Walls". The series was precipitated when, in early December 1970, the Attorney General of Pennsylvania "opened the prison doors to newsmen, permitting them for the first time to talk at length with inmates and administration alike". (Affidavit of Jack Grochot)

Following a general statement regarding the animalization of the inmates wrought by the conditions of Western Penitentiary, a State Correctional Institution located in Pittsburgh, the December 13 article focuses on the admission to the prison of a new inmate, Harold T. Sherlock. Sherlock, the article indicated, had been convicted of participating in a "robbery which ended in death for an ex-Marine". Coincidentally, on the day that Sherlock was being admitted, the plaintiff was being released. The meeting was described by Grochot as follows:

> "He [Sherlock] was herded into a reception room. Standing there was 67-year-old James Henry Kent, dressed in a gray gabardine suit and waiting patiently for his final release papers—he was getting out after 27 years.
>
> He, too, had taken a life."

The plaintiff's action revolves specifically around the reference to his having taken a life.

The facts relating to Kent's imprisonment and release are not contested.[2] On

1. The article is attached hereto as Appendix A.

2. The plaintiff contends that the ultimate dismissal of the charges on which he was convicted, having restored his legally presumed innocence, renders the fact of the conviction immaterial. The legal erasure of the conviction obviously does not undo

August 30, 1944, he was indicted in the Court of Oyer and Terminer of Somerset County, Pennsylvania, for the murder of George Kern. After one trial resulting in a hung jury, he was convicted on December 14, 1944 of murder in the first degree. On May 17, 1946,[3] he was sentenced to life imprisonment in the Western Penitentiary. Exactly twenty-three years to the day later Kent filed a petition under the Pennsylvania Post Conviction Hearing Act. Acting on the petition, the Court of Common Pleas of Somerset County, after a hearing, granted him a new trial.[4] The ground for the grant was the failure of the trial court to consider the issue of the voluntariness of Kent's "tacit admissions of guilt" made while he was in pretrial custody. Subsequent to the grant, a "Motion To Nol Pros" presented by the District Attorney of Somerset County was allowed and Kent was ordered released.

Apparently all of the information which Grochot wrote about Kent was told Grochot by Kent. In the affidavit which Grochot submitted in support of the defendants' motion, he states that at the chance meeting with Kent he asked him "what his name was, how long he had been in, what he was in for and where he was going". Further he states that,

"I did not ask him why he was being released nor did he tell me why. I assumed that his term was up. In my own mind, the relevance with respect to Kent was his having spent 27 years in the Penitentiary on a conviction for the same type of crime Sherlock had been convicted of."

The plaintiff has in no way countered Grochot's affidavit and, in fact, during

his deposition he conceded that he did not know whether or not Grochot knew when he wrote the article that his conviction had been overturned. The plaintiff's rejoinder is simply to contend that further discovery may establish proof of "reckless publication" presumably in that Grochot's investigation prior to the publication of the article regarding its contents was insufficient "since if he didn't know it [that his conviction had been overturned] he could have gotten it".[5]

F.R.C.P. 56(c) provides that summary judgment shall be entered,

". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Further, F.R.C.P. 56(e) requires that,

"[W]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

These latter sentences were added to the rule in 1963, as the Advisory Committee noted, ". . . to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device." See 6 Moore's Federal Practice ¶56.01[14]. Further the Advisory Committee stated that,

---

the fact of the conviction, and as it relates to his presence in the reception room, it is material. For purposes of the present motion, however, the article will be treated as false and defamatory.

3. The inordinate lapse of time was occasioned by Kent's escape from jail after conviction but before sentencing. He managed to elude recapture for about one year.

4. Commonwealth v. Kent, No. 3 September Term 1944 (April 8, 1970).

5. From the "Answer Of Plaintiff To Motion For Summary Judgment" and from plaintiff's and plaintiff's counsel's responses and remarks, respectively, during the deposition of the plaintiff.

"[T]he amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary."

Thus the rule requires, as amended in 1963, that if the moving party establishes at the threshold, by depositions, answers to interrogatories or affidavits, that there is no genuine issue of material fact and that on the established and uncontroverted facts the moving party is entitled, as a matter of law, to a judgment, the opposing party cannot stand on the pleadings but is obligated to produce documents or make discovery to expose the genuine issue of material fact. Jacobson v. Maryland Casualty Co., 336 F.2d 72 (8th Cir. 1964), cert. den'd., 379 U.S. 964, 85 S.Ct. 655, 13 L.Ed.2d 558 (1965); Missouri Pacific Railroad Co. v. National Milling Co., 409 F.2d 882 (3rd Cir. 1969); Anderson v. Ford Motor Company, 319 F.Supp. 134 (D.C.E.D. Mich., S.D.1970); and 6 Moore's Federal Practice ¶56.22[2]. In Robin Construction Company v. United States, 345 F.2d 610 (3rd Cir. 1965), the 1963 amendments to F.R.C.P. 56(e) were reviewed, and it was stated that,

"[T]he line of decisions of this Court which in the past permitted a litigant to be sheltered against summary judgment by the allegations of his pleading, no matter how much they may have been challenged by detailed and specific affidavits or disclosures in discovery, has been overthrown by the 1963 amendments to Rule 56."

The Court concluded that the rule, as amended, "must be made fully effective".

In Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) it was decided that in libel cases involving the publication of matters of public or general concern the First Amendment applies to state law [6] so as to require a showing, by clear and convincing proof, "that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not". In Time, Inc. v. Hill, 385 U.S. 374, 87 S. Ct. 534, 17 L.Ed.2d 456 (1967) it was held that state invasion of privacy laws could not constitutionally allow recovery for invasion of privacy in instances involving reports of matters of public interest absent proof that the report was published "with knowledge of its falsity or in reckless disregard of the truth".

Further, *Rosenbloom* stands for the proposition that the duty of federal courts is to "in proper cases review the evidence to make certain" that constitutional principles are correctly applied. Although in *Rosenbloom* there had been a trial, I think that the need to preserve unintimidated the First Amendment freedom of the press compels a review of the facts and inferences of facts, of course taking both in the light most favorable to the plaintiff,[7] to determine whether or not summary judgment may be granted. As stated in Washington Post Company v. Keogh, 125 U.S.App. D.C. 32, 365 F.2d 965, 968 (1966), cert. den'd., 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967),

"[S]ummary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement".

[Citations omitted.]

---

6.  The libel and invasion of privacy laws of Pennsylvania, which need not be reviewed by elements for purposes of the present motion, are explored at length in Corabi v. Curtis Publishing Co., 441 Pa. 432, 273 A.2d 899 (1972).

7.  First Pennsylvania Banking and Trust Co. v. United States Life Insurance Co., 421 F.2d 959 (3rd Cir. 1969) and Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3rd Cir. 1966).

"In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate."

See also Time, Inc. v. McLaney, 406 F. 2d 565 (5th Cir. 1969) cert. den'd., 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).[8] At the outset, then, I will consider whether or not there is a genuine issue relating to the standard of "knowing or reckless falsity".

There is no suggestion by the plaintiff that the defendants knew the article to contain false statements. The position of the plaintiff is that if Grochot had investigated the matter he could have found the reason for Kent's release and would have then been bound by the presumption of innocence.

In *Rosenbloom*, citing St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), it was stated that the

"cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

In the context of the motion for summary judgment in this action, particularly in light of F.R.C.P. 56(e), the specific inquiry must be as to the sufficiency of the proferred support for the contention that the publication was recklessly false.

There is apparently no dispute with respect to the source of Grochot's information. Nor is there an apparent dispute as to whether or not Grochot or the Press bore Kent malice or ill will or intended him harm, if it is significant.[9] Against this backdrop, the plaintiff offers no support for his necessary contention that the defendants in fact entertained serious doubts as to the truth of the statement that he had taken a life. Obviously if Grochot had checked the court records relating to Kent, he could have discovered the reason for his release. Obviously too, however, he had no reason in the circumstances to entertain *any* doubts, quite apart from serious doubts, as to the matter of Kent's release. The plaintiff has presented neither possible evidence nor a hope for possible evidence, either direct or circumstantial, bearing on Grochot's thought processes surrounding the writing of the article.[10] In all of these circumstances, heeding F.R.C.P. 56(e), I think there is no genuine issue of fact as to the standard of knowing or reckless falsity in the writing and publication of the article of December 13, 1970.

■ In the absence of a genuine issue as to the defendants' knowledge of the truth or falsity of the article, then, the issue pivotal to the disposition of the defendants' motion becomes whether the utterance involved concerns an issue of public or general concern.

8. All of this is not to say, of course, that summary judgment is always appropriate. See, e. g., Time, Inc. v. Ragano, 427 F.2d 219 (5th Cir. 1970).

9. *Rosenbloom* is inconsistent as to the relevance of malice. In footnote 18 it is pointed out that, "ill will toward the plaintiff, or bad motives, are not elements of the New York Times standard", and it is suggested that jury instructions be couched in terms of "knowing or reckless falsity" rather than "actual malice". In the body of Mr. Justice Brennan's opinion, however, the standard set forth at page 6 refers to "actual malice". The seeming inconsistency is reconciled by regarding malice as a mode of operation rather than as a motive for the recklessness. "Actual malice" is simply a confusing label for subjective imprudent investigation. See Goldman v. Time, Inc., 336 F.Supp. 133 (D.C.N.D.Cal.1971) and Greenbelt Co-op Publishing Association v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L. Ed.2d 6 (1970). Even at that, it would seem nonetheless to be, as a motive for, a factor in fixing recklessness.

10. Cf. Cerrito v. Time, Inc., 449 F.2d 306 (9th Cir. 1971) aff'g 302 F.Supp. 1071 (D.C.N.D.Cal.1969).

The decisional origin of the constitutional protection afforded what might otherwise be actionable libel by *Rosenbloom* was New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *New York Times* it was held that for a "public official" to sustain a libel action against a newspaper clear and convincing proof was required that the defamatory falsehood was uttered with "knowledge that it was false or with reckless disregard of whether it was false or not". In Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the limitation of the protection of the so-called "knowing-or-reckless-falsity standard" to public officials was whittled so as to extend the protection to "public figures". Finally, in *Rosenbloom* "against the background of the functions of the constitutional guarantees for freedom of expression", the protection was extended to matters of "public or general concern". The Supreme Court cautioned in *Rosenbloom,* however, that it was not to be misconstrued as "implying that no area of a person's activities falls outside the area of public or general interest", and that the reach of the concept would have to be delineated in future cases.

The plaintiff argues preliminarily that neither he personally nor his release was a matter of public interest in 1970 since his 1940's notoriety was too remote in time. The defendants argue, on the other hand, that his prior notoriety was not remote and that he was of continuing public interest. I think the arguments irrelevant. In *Rosenbloom* it was stated that,

"[I]f a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

The focus of the articles was on prison conditions and prison reform. It was only because of the plaintiff's relationship to that focus that he was drawn into the articles. Further, the reference to the plaintiff was limited to his relationship to that focus. His only exposure was in connection with his term in prison—it was slight and limited. The existence, then, of a reasonable relationship between the general subject matter of the articles and the reference to the plaintiff, and a reasonable coextensiveness of the subject matter and the reference, I think renders Kent's prior personal anonymity or notoriety unimportant.

There remains only to decide whether or not the articles dealt with a matter of "public or general concern". In Thornbill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) it was postulated that,

"[F]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."

Prison conditions and reform, the general subject matter of the articles involved, is a matter eminently germane to the exploration and development of solutions to societal incivilities and inharmonies. Statistics on recidivism and recent in-prison events have made that painfully clear. Moreover, it is a matter about which, sadly, little or no accurate information was, in 1970, or is today, although the gap is narrowing, available to the public. I conclude that the general subject matter of the articles written by Grochot and published by the Press was one clearly concerning an issue of "public or general concern" and, again, was one which regarded Kent reasonably and coextensively *vis-a-vis* his involvement in that concern.[11]

11. Cf. Goldman v. Time, Inc., supra.

## APPENDIX A

# Animal Howls, Attacks Fill Nightmare Of Western Pen

**By JACK CROCHOT**

In a 100-year-old stone and barbed wire warehouse — Western Penitentiary — animal instincts dominate.

And, according to a standing inside joke among the dozen psychologists there, it would take a medical expert to conclude that the 1,000 inhabitants technically classify as living human beings.

Minds deteriorate.

Men rape each other.

### Knife In The Back

When one refuses another's advances, violence results: A hand-fashioned knife in the back while marching to chow; a brutal beating in the narrow passageway that separates the five-tiered cellblocks.

Out of agonizing monotony, purposeless men often turn to hate, first for each other, then guards, judges, and ultimately for every free person.

When hating grows monotonous, some prisoners chirp like canaries in cages so small that outstretched arms can touch all four walls. To the walls are fastened a cement sink, toilet and slab — the latter covered with a mattress and two wool blankets.

Others, however, prefer to howl like coyotes, or just moan from an intangible pain.

From the instant a convicted man, ambles through the giant stainless steel door of the old prison in the North Side's

### Behind The Walls

*Pennsylvania's system of corrections more appropriately should be described as one of punishment, according to Gov. Raymond P. Shafer.*

*He has denounced the system as an "abysmal failure."*

*With that in mind, State Atty. Gen. Fred Speaker opened the prison doors to newsmen, permitting them for the first time to talk at length with inmates and administration alike.*

*This is the first in a four-part series disclosing what's been going on behind the walls, and what lies ahead.*

Woods Run section, the dehumanizing process swallows him.

Take a ride with Harold T. Sherlock to "The Pen," where he will spend at least

10 years — and maybe 20 — for his part in the robbery that ended in death for an ex-Marine in Homestead last April.

His hands shackled, Sherlock, 31, clutched the paper sack containing his belongings and strutted briskly between two deputy sheriffs, leaving Allegheny County Jail.

In the sheriff's cruiser, Deputy James Dittler radioed headquarters. His choppy communication was prophetic as the van rolled up the ramp on Fort Duquesne Boulevard:

"In service on the Bridge to Nowhere."

At the conclusion of the six-mile ride, Sherlock took a quick glance at the outside world and disappeared through the glistening door, which echoed as it closed and locked.

He was herded into a reception room. Standing there was 67-year-old James Henry Kent, dressed in a gray gabardine suit and waiting patiently for his final release papers — he was getting out after 27 years.

He, too, had taken a life.

### A Dreadful Place'

Sherlock stared as Kent gently shifted his weight from one foot to another, wearing new shoes — prison issue that resembled a mill man's dull maroon work boots.

Sherlock whistled between his teeth as

[A6619]

he overheard Kent whisper repeatedly to himself that "This is a dreadful place."

Kent eventually sat at a table to sign a document that attested the $384 in his bank account was an accurate tabulation of the 9,855 days of labor as a maintenance man, at an average salary of 60 cents for each day — minus cigarette money and the 10 per cent withheld for savings bonds.

Two guards escorted Kent to the Greyhound bus depot downtown.

Later, one guard told his colleagues how the freed man found it difficult getting out of the car because of the "confounded new-fangled door handle."

He also had trouble figuring how to use a pay phone, and difficulty purchasing a ticket to Johnstown so he could live with his sister.

Meanwhile, Sherlock was ordered into a bathroom to strip and don his dark blue denims. Then he signed some papers, listing his property — a wristwatch, lighter, coins.

### 100 Men Per Counselor

In return for surrendering his valuables, Sherlock was given a rundown of rules, and a number, which appeared under his name on the door of a cell.

For the next 90 days he would be observed once or twice by a counselor,

[A6657]

who is also responsible for about 100 more inmates.

If it is determined Sherlock shows ambitions to make license plates, or lockers for the National Guard, or bed frames for state institutions, he will be given the opportunity.

If he makes license plates, he will sit at a machine for eight hours a day and feed it a piece of tin, then another, then another, and another . . .

If he shows no inclination for these tasks, he might qualify to cook, cut hair, sweep, assist in the dispensary, or pound out designs in leather for women's purses.

And if he wants to earn a high school diploma or college credits, he can go to night classes three times a week.

That's something started by Warden Joseph R. Brierley since he took over the jail after being assistant superintendent at Eastern Penitentiary in Philadelphia. In the last part of a phase-out program, it is the only other maximum security lockup in Pennsylvania

But if Sherlock turns out like the 600 unoccupied, unmotivated, unskilled and bitter inmates — who either can't or won't take advantage of the time consuming exercises — his soul could soon feel the crush of defeat.

TOMORROW—The long, long days.