**GLOBAL WASTE RECYCLING, INC.**

v.

**Henry MALLETTE, Jr., et al.**

**No. 98–597–Appeal.**

Supreme Court of Rhode Island.

Dec. 14, 2000.

John B. Webster, Warwick, for Plaintiff.

Mark W. Freel, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this case Global Waste Recycling, Inc. (Global), the plaintiff below, appeals from the entry of summary judgment in favor of the defendant on its Superior Court civil action in which Global had sought both "economic damages" as well as punitive damages from the defendants, Henry and Marcia Mallette.

On appeal, Global contends that the trial justice erred in granting summary judgment after finding that its civil action was barred by virtue of the provisions of G.L. 1956 chapter 33 of title 9, the Strategic Litigation Against Public Participation statute (the anti-SLAPP statute). We reject Global's contention and affirm the grant of summary judgment.

## I

### Case Facts/Travel

Since June 30, 1995, Global has been operating an unlicensed construction and demolition debris recycling facility located in an area that is zoned for residential use on Colvintown Road in the Town of Coventry. Global has been permitted to operate its debris recycling facility there pursuant to a consent judgment and operation plan entered on June 30, 1995, between the state Department of Environmental Management (DEM), Bettez Recycling, Inc., Bettez Construction Company, Inc., (Bettez), and Global. Some background information concerning the property site in question is helpful.

From 1981 until 1989, Tri County Sand and Gravel, Inc., had operated a construction and demolition debris recycling facility on the land. During that time it had permitted large stockpiles of unsold debris and materials to accumulate on the site. In March 1990, Bettez began operating an unlicensed landfill on the property. Following complaints and on-site inspections, the DEM, Division of Air and Hazardous Materials, issued notices of violation. Following DEM hearings on the violation notices, Bettez was ordered by a final DEM agency decision, entered on March 5, 1991, to "cease receiving materials, dispose of the materials on site and pay an administrative remedy to the DEM." Bettez filed an administrative appeal from that DEM final decision in the Kent County Superior Court.

While that administrative appeal was pending, Global became interested in operating a construction and demolition debris recycling facility on the Bettez property site and moved to intervene in Bettez's pending appeal. Once in the case, Global then undertook to negotiate a settlement with DEM. On June 30, 1995, a negotiated settlement was reached. The settlement was evidenced by a consent judgment that included an operating plan in which Global would be permitted to operate a construction and demolition debris recycling facility on the Bettez site. The operating plan that was spelled out in the consent judgment contained several conditions that Global was required to comply with and perform. The operation plan, however, did not constitute a DEM license for the operation; instead, it was in the nature of a conditional permit that required, among other obligations, for Global to immediately process 75 percent of the six then-existing on-site stockpiles of demolition materials left there by Bettez. In addition, Global was required to furnish DEM with a closure fund and to comply with all applicable state, federal and local requirements, including any new regulations for licensing and regulation of recycling and solid waste management facilities.

On December 16, 1996, Global was notified by the DEM Office of Waste Management that violations of Global's Waste Recycling Operation Plan were observed following a site inspection by DEM officials on December 12, 1996. One of those alleged violations concerned "substantial quantities of processed construction and demolition material" being left on the site. Those expanding construction and demolition material stockpiles had also been observed by many of the local residents living in the area, including Henry Mallette, Jr. and his wife, Marcia Mallette, whose residence unfortunately adjoins the Global site. As the Global stockpiles expanded, so did the Mallette's concern over the possibility of contamination of their well water, of airborne pollutants from composted materials left on the site, and the fire hazard created by the stockpiled demolition debris. The Mallettes, joined by some forty-two other similarly alarmed Colvintown Road residents, filed a petition with the Coventry Town Council seeking relief from Global's expansion of those conditions at its facility. That petition was presented to the town council in mid July, 1997. The Mallettes, however, were not present at the council meeting.

As was feared and anticipated by the Colvintown Road residents, including the Mallettes, on July 30, 1997, a fire did break out on Global's site. Counsel for Global, in attempting to minimize the significance of that incident, has described that fire as being "a small fire * * * that was extinguished in less than one hour." That description is certainly at great odds with that recounted by the Coventry fire chief and the Coventry police, who were at the scene, and who described the fire as breaking out "shortly after 5 p.m." and throwing heavy "dark blackish-blue smoke" over the area and prompting the necessity of "fire trucks from Washington, Western Coventry, Chopmist Hill, Potterville, West Greenwich, Scituate, Hope Jackson, Mishnock, West Greenwich [sic ], Nooseneck Hill, Hianloland and North Smithfield fire departments." The Coventry fire chief informed the local press that firefighters "had to break [the pile of wood] up with bulldozers" and were required to douse the pile with water and "class A foam." The firefighters were unable to control and extinguish the fire until 7:30 p.m.

During the ongoing fire, a news reporter from the local Kent County Daily Times newspaper spoke with and interviewed several of the many local residents at the fire scene. One of those persons interviewed was Henry Mallette, Jr., one of the two defendants in this case. Mallette is reported to have said, "[w]ho knows what they're burning over there. They say its mulch, but I know what it is. It's lead and asbestos and every other thing."[1] Some eight days later, while the newspaper was doing follow-up stories on Global's operation and the ongoing neighborhood concern over Global's operation of its yet unlicensed construction and demolition debris recycling facility, one of its reporters spoke with Marcia Mallette, Henry's wife, and codefendant. She told the reporter that "[o]ld homes are taken in there and piled up, they just sit there. I don't think any recycling is going on."[2] Her comment, along with that of others, was reported in the Kent County Daily Times on August 9, 1997.

Three days later, on August 12, 1997, Global initiated a civil action for defamation against the Mallettes, claiming that its construction and demolition recycling business and reputation had been destroyed by the publication of the Mallettes' statements in the Kent County Daily Times. Global sought both "economic damages" as well as punitive damages from the Mallettes. Four months later, on December 8, 1997, a Superior Court hearing justice granted summary judgment in favor of the Mallettes after finding that Global's action constituted an attempt by Global to silence legitimate statements on a matter of public concern. An interlocutory order reflecting that finding was entered on January 12, 1998. Thereafter, on April 23, 1998, following a hearing on the Mallettes' request for counsel fees, an order awarding counsel fees against Global was entered and final judgment in the case entered on that same day. Global's appeal followed on May 5, 1998.

## II

### The Anti–SLAPP Statute

In *Hometown Properties, Inc. v. Fleming*, 680 A.2d 56 (R.I.1996), this Court had

---

1. Mallette, in an affidavit, says he was misquoted. He states that he told the reporter "God knows what's burning. There's lead and asbestos and who knows what else in those piles."

2. On January 31, 1997, the Mallettes had received a copy of DEM's letter to Global advising Global that among other noted site inspection deficiencies, that its DEM

"inspector noted that substantial quantities of processed construction and demolition material is not leaving the site. Please be advised that if this material is not reused then this office regards the material as discarded in a manner as to constitute the unpermitted disposal of solid waste. Please provide this Office with documentation which indicates that the material is being recycled."

occasion to construe for the first time the provisions of chapter 33 of title 9, as enacted by P.L.1993, ch. 354, being entitled "Limits on Strategic Litigation Against Public Participation" (the anti-SLAPP statute or the act).

In *Hometown,* we determined the act to be constitutional, and intended to emulate the federal Noerr–Pennington doctrine[3] by providing conditional immunity to any person exercising his or her right of petition or free speech under the United States or Rhode Island Constitution concerning matters of public concern. That conditional immunity, we held, would render the petitioner or speaker immune from any civil claims for statements, or petitions, that were not sham by virtue of being objectively or subjectively baseless. Section 9–33–2(a) of the anti-SLAPP statute defines a sham statement or petition as being one that is:

"(1) Objectively baseless in the sense that no reasonable person exercising the right of speech or petition could realistically expect success in procuring the government action, result, or outcome, and

"(2) Subjectively baseless in the sense that it is actually an attempt to use the governmental process itself for its own direct effects. Use of outcome or result of the governmental process shall not constitute use of the governmental process itself for its own direct effects."

The Mallettes, in their answer to Global's complaint, raised the issue of their conditional immunity provided by § 9–33–2. They subsequently and properly moved for entry of summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure.

The Superior Court motion hearing justice, after considering the Mallettes' motion for summary judgment, and after viewing the case pleadings and affidavits in the light most favorable to Global and against the Mallettes (*see LaFratta v. Rhode Island Public Transit Authority,* 751 A.2d 1281, 1283 (R.I.2000)), found that the Mallettes' statements were neither objectively sham nor actionable in light of the immunity protection afforded those statements by virtue of § 9–33–2. The hearing justice noted:

"In the instant case, the Mallettes made comments or remarks about an issue which was clearly one of public concern. Not only is the operation of a 94 acre recycling plant on its face a matter of concern, the issue of this recycling was and had been a matter of public concern. It had been the subject of D.E.M. proceedings as well as a petition presented to the local Town Council. Pollution and environmental contamination is a matter of concern to the public as well as to the residents of the communities in which the recycling plant and landfill are operated. This is unquestionable.

"The Mallettes' remarks were typical of those frequently made by citizens, taxpayers, neighbors or other residents of the community who wish to spark or spur governmental action or to otherwise obtain a satisfactory resolution of their concerns. Making loud and public complaints to newspaper reporters is a frequently used method for members of a community to affect local matters of interest or concern. Members of the public and residents of neighborhoods often use the news media as a forum for communicating their concerns to whatever governmental authorities may have an interest in or power over the matter at hand. This method is frequently successful in achieving a response from local town administrators to governors, to legislators to presidents. Concerning the American experience, it's undoubted-

---

**3.** *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). *See also Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

ly realistic to expect some success in securing a governmental response when this method is utilized.

"Considering the undisputed facts material to the issues raised by the motion, the criteria for objective baselessness is not met. The remarks are not objectively baseless in the sense that no reasonable person exercising the right of free speech could realistically expect some success. Given that the remarks were also based on the Mallettes' personal observations as well as the history of information gleaned from the D.E.M., any expectation that favorable governmental action or outcome to be had here could not be deemed to be unreasonable.

"The motion for summary judgment is granted. The Mallettes are entitled to conditional immunity. The remarks were not objectively baseless."

### III

### Global's Appellate Contentions

On appeal, Global challenges the propriety of the motion hearing justice's grant of summary judgment in favor of the Mallettes. Global asserts here that (a) the policy of the anti-SLAPP statute was not intended to bar claims for tortious actions

brought by a litigant who has "suffered actual economic injuries from baseless attacks upon [its] business reputation[;]" (b) the statements by the Mallettes were not made at a "judicial, administrative or legislative proceeding[;]" and (c) that the term "issues of public concern as contained in the anti-SLAPP statute is void as being unconstitutionally vague."

■ This Court, when reviewing the grant of a motion for summary judgment does so on a *de novo* basis. *See Macera Brothers of Cranston, Inc. v. Gelfuso & Lachut, Inc.*, 740 A.2d 1262, 1264 (R.I. 1999) (per curiam). In the case at bar, we have reviewed the case pleadings and affidavits submitted by the Mallettes as well as other case file materials and have done so in a light most favorable to Global to determine if the Mallettes were entitled to summary judgment as a matter of law. *See Truk–Away of Rhode Island, Inc. v. Aetna Casualty & Surety Co.*, 723 A.2d 309, 313 (R.I.1999). Following that review, we are convinced that the hearing justice did not err and that summary judgment in favor of the Mallettes was appropriate. We conclude that Global's appellate issues, cleverly fashioned to misstate both material facts as well as the provisions of § 9–33–2(a), are without merit.[4]

---

4. Global's contention was prefaced by its alerting us that "this Court should be aware that at no time prior to the statements being made [by the Mallettes] was Global going through *any form* of *permitting* or *licensing process* * * * with any state * * * agency." (Emphasis added.) That contention is factually erroneous. A letter dated July 7, 1997, to Global from Leo Hellested, DEM Supervising Engineer, Office of Waste Management, a copy of which is contained in the Mallettes' affidavit, sets out clearly that as a result of earlier site inspections of Global's facility by DEM, it was "noted that a substantial quantity of processed construction and demolition material continues to be stockpiled on the site." Additionally, DEM, in its letter, noted: "*Also please be reminded, as we discussed during the May inspection, that the Department is still awaiting a revised license application submittal* that more completely addresses all of the requirements of the revised *Rules and Regulations for Composting Facilities and Solid Waste Management Fa-*

*cilities, January, 1997."* (Emphasis added and in the original.)

Earlier, on December 16, 1996, DEM had notified Global of its "substantial quantities of processed construction and demolition material" that were not being removed from Global's facility and which could be regarded as "unpermitted disposal of solid waste." Judith Sine, a DEM engineer, also noted that Global recently had acquired a "new shredder and screen" and that pursuant to the June 30, 1995 consent judgment (section 5–C), under which Global was permitted to operate its facility, Global was required to submit any proposed expansion of its site equipment to DEM for approval, and for amendment to the Operation Plan provided for in the consent judgment. Thus, contrary to what Global has asserted to us, both in its appellate brief and at oral argument, there was indeed both ongoing Global licensing and permit proceedings at the time the Mallettes' statements were made.

## (A)

■ Global, in its initial and rather rhetorically phrased opening appellate contention, asserts that the legislative policy embodied within our anti-SLAPP statute never was intended to bar civil actions brought by a litigant who has "suffered actual economic injuries from baseless attacks upon [its] business reputation." That contention would have merit if the facts in this case were such as to warrant any inference that the statements made by the Mallettes and concerning Global's operation of its construction and demolition debris recycling business were "baseless" or sham statements when made. However, that is not the case here.

The motion hearing justice specifically found that the statements made by the Mallettes were not objectively baseless and thus, not sham and, as a result, Global's suit was barred pursuant to the express immunity provisions of § 9–33–2(a). Because our *de novo* review of the case filings and affidavits leads us to that same conclusion, we reject Global's initial appellate assertion of error as being meritless.

## (B)

As to Global's next contention that "the invocation of the immunity provided by the anti-SLAPP statute" requires that the statement or statements for which immunity is claimed, "must be made *before* some type of legislative, judicial or administrative body" and "not to the public via the print media," such contention is both novel and meritless.

We noted in *Hometown Properties, Inc.,* that the Legislature's clear intention for enacting the anti-SLAPP statute in 1993 was to allow the "full participation by persons and organizations and robust discussion of issues of public concern before the legislative, judicial, and administrative bodies, *and in other public fora.*" 680 A.2d at 61 (quoting § 9–33–1). (Emphasis

added.) Section 9–33–1 of the anti-SLAPP statute makes clear the Legislature's disfavor of lawsuits brought primarily to "chill the valid exercise of the constitutional rights of freedom of speech" by persons making public statements in connection with an issue of public concern. Section 9–33–1 not only encourages but also protects "robust discussion of issues of public concern" in the "public fora." In 1995, the Legislature specifically amended § 9–33–2 to provide explicit immunity to persons and organizations making statements not objectively or subjectively baseless in the course of robust discussion of public concern. P.L.1995, ch. 386, § 1.

In this case, we are satisfied that the hearing justice carefully reviewed and considered whether the statements made by the Mallettes were objectively baseless. She found that they were not, and that the immunity from suit provided by the anti-SLAPP statute protected the Mallettes from Global's alleged defamation claims. We also have reviewed the hearing record and case filings and likewise conclude that the statements by the Mallettes were not objectively baseless and were thus entitled to immunity from civil suit as provided for in § 9–33–2(a). Indeed, we additionally observe that the facility, as found to be conducted by Global, whether licensed, permitted, or in operation before the Mallettes and their neighbors moved to Colvintown Road, actually might constitute an actionable private nuisance to the Mallettes and their neighbors.[5] *See, e.g., Weida v. Ferry,* 493 A.2d 824, 826–27 (R.I. 1985).

## (C)

■ Global's final appellate contention is that the term "issues of public concern" contained in § 9–33–2(a) is "overly broad, ambiguous and without a definable, concrete meaning" and thus "in violation of the due process clauses of both the Rhode

---

5. The stockpiles, without an adequate closure-fund as required by DEM, apparently still remain on Global's site. *See Reitsma v. Global Waste Recycling, Inc.,* C.A. KC–57.

Island and United States Constitution" requires but scant consideration.

We respond to that constitutional challenge in two ways. First, the term "issues of public concern" is not so "overly broad, ambiguous and without a definable, concrete meaning," as contended by Global, excepting perhaps only to Global. That phrase and wording, we point out, enjoys a long, distinguished and unchallenged career in both state and civil defamation actions as well in tortious conduct actions, pursuant to 42 U.S.C.A. § 1983. *See, e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Pickering v. Board of Education of Township High School District 205, Will County,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994); *Vukadinovich v. Bartels,* 853 F.2d 1387, 1390 (7th Cir.1988); *Kent v. Pittsburgh Press Co.,* 349 F.Supp. 622, 627 (W.D.Pa.1972); *Caron v. Silvia,* 32 Mass. App.Ct. 271, 588 N.E.2d 711, 714 (1992); *Burkes v. Klauser,* 185 Wis.2d 308, 517 N.W.2d 503, 510 (1994).

▬ Secondly, we observe, as did the motion hearing justice, that Global both failed and neglected to comply with its clear obligation when challenging the constitutionality of a state statute to "serve the attorney general with a copy of the proceedings within such time to afford the attorney general an opportunity to intervene." Super.R.Civ.P. 24(d). *See also* G.L.1956 § 9–30–11. We do not believe that this Court should undertake to determine the constitutionality of a state statute in a given case without first affording the Attorney General the opportunity to intervene and be heard. *See Crossman v. Erickson,* 570 A.2d 651, 654 (R.I.1990).

For the reasons herein above set out, we deny and dismiss Global's appeal, affirm the summary judgment in favor of the Mallettes, and the award of counsel fees made to counsel for the Mallettes for services rendered in the Superior Court.

Before we remand the papers in this case to the Superior Court, we direct counsel for the Mallettes to furnish this Court with a detailed request for counsel fees and any costs relating to this appeal, and direct that a copy thereof be submitted to counsel representing Global. This Court will, after consideration of counsel's request and any objection filed thereto, award an appropriate fee to Mallettes' counsel for his appellate representation of the Mallettes.

Justice FLANDERS, did not attend oral arguments, but participated on the basis of the briefs.