**KINGSTOWN MOBILE HOME PARK, Pearl Krzak**

v.

**Michael A. STRASHNICK.**

**Nos. 99–166–Appeal.**

Supreme Court of Rhode Island.

June 26, 2001.

John J. Kupa, Jr., North Kingstown, for Plaintiff.

Richard L. Walsh, III, North Kingstown, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

Can a tenant of a mobile home park be evicted for reasons other than those enumerated in the Rhode Island Mobile and Manufactured Homes Statute (mobile home act) if the tenant does not have a written lease and has remained in possession as a month-to-month or holdover tenant? Pearl Krzak (Krzak), the owner and operator of Kingstown Mobile Home Park (the park), has appealed a judgment by the Superior Court that denied her eviction claim and her constitutional challenge to G.L.1956 § 31–44–2 (the statute) and granted the counterclaims of her tenant, Michael A. Strashnick (Strashnick), for malicious prosecution and reprisal. A summary of the pertinent facts and the applicable statutes is presented as necessary for our discussion of the issues on appeal.

### Factual Background and Relevant Statutes

Since 1946, Krzak has owned and operated Kingstown Mobile Home Park in North Kingstown, Rhode Island. The park contains approximately 125 mobile home lots, all but seven or eight of which were occupied at the time of trial, each at a monthly rental fee between $260 and $285 per lot. In 1993, Strashnick bought an older mobile home formerly owned by Krzak's son's mother-in-law, and he became a tenant at 29 A Krzak Road.

Apparently from the beginning, the relationship between landlord and tenant was contentious. Krzak, who had a policy of not granting year-long leases unless they began in January and ended on December 31, testified that only about twenty-five of her tenants had leases and that she considered all other residents "month-to-month" tenants. Given that § 31–44–7(1)(xiv) requires that the operator of a mobile home park "[p]rovide a written lease of not less than one year unless the resident requests in writing a shorter term, or unless a resident in writing states that he or she does not desire a written lease," Strashnick, whose tenancy began after August 1993, refused to sign the four-month lease offered by Krzak. Instead, he requested a one-year lease, which Krzak refused. At that point Strashnick left without signing, taking with him a copy of the lease and park regulations.

At the time he applied for tenancy in the park, Strashnick was required to pay a nonrefundable $140 application fee. Section 31–44–3(8)(i) states in pertinent part that "[a] prospective resident shall not be charged an entrance fee for the privilege of leasing or occupying a lot, except as provided in § 31–44–4," which is the section relating to the sale of mobile and manufactured homes.[1] Although this section was applicable to Strashnick's purchase of an existing mobile home in the park, a nonrefundable fee was violative of Rhode Island law, and Strashnick subtracted the amount from his first rental payment. Krzak vehemently denied this

---

1. Pursuant to G.L.1956 § 31–44–4(g)(2), "[i]f the park owner or management collects a fee or charge from a prospective purchaser of a mobile and manufactured home in order to obtain a financial report or credit rating, the full amount of the fee or charge shall be credited toward payment of the first month's rent for that purchaser."

transaction at trial, acknowledging that such a charge was illegal. Krzak's denial was contradicted by her handwritten notation on Strashnick's canceled check: "nonrefundable application processing fee and credit check." [2]

In late November 1996, Strashnick and other residents received a notice postmarked November 27, 1996, for a rental increase effective January 1, 1997. Because G.L.1956 § 31–44.1–2(b) provides that "[a]ny person who owns, operates, or maintains a mobile and manufactured home park pursuant to the provisions of chapter 44 of title 31 shall give the mobile home owners of the park sixty (60) days written notice prior to any lot rent increase going into effect," Strashnick enclosed a letter to Krzak in his January rental payment, explaining that in light of the improper notice, he was paying his usual rent and would comply with the increase only when he received the sixty-days' notice provided by law.

At trial, Krzak testified that in the previous five years, she had evicted only a few tenants from the park, all for the nonpayment of rent, but that she was seeking to evict Strashnick as a month-to-month tenant for "all the things that he's done without permission." Strashnick, in addition to other extensive renovations of his mobile home, replaced an existing metal garden shed with another shed, removed some shrubbery, and poured a concrete slab. Krzak also testified that she did "not appreciate it" when Strashnick addressed her as "Pearly baby" and used other offensive language. She expressed her frustration with Strashnick: "He wouldn't do anything that he doesn't feel like he wants to do, and he tells ya that, too."

The record before us revealed that differences between the parties frequently ended in Krzak's initiating litigation, the long saga of which we need not discuss in detail for our analysis. In July 1995, Krzak filed an eviction claim against Strashnick for violating parking regulations and for erecting too large a garden shed.[3] After a hearing in August 1996, a District Court judge permitted Strashnick to cure the breach and dismissed his counterclaim for "harassment." In May 1996, as the result of another complaint by Krzak, Strashnick was permitted by a Superior Court justice to erect a carport over the then-existing concrete slab. In October 1996 and August 1997, Krzak sent notices of "Termination of Tenancy" to Strashnick, requesting that he remove himself and his mobile home from the park within sixty days. The first notice stated that Strashnick's tenancy was "a periodic one on a month-to-month basis" and was being terminated "pursuant to Rhode Island General Laws 31–44–2 and 34–18–37." A second notice added that the reason for the month-to-month tenancy was Strashnick's failure to sign a lease. Strashnick ignored both notices, and in October 1997, Krzak filed a complaint for Strashnick's eviction as a holdover tenant. After a District Court judge found in favor of Strashnick, Krzak filed for a trial *de novo* in Superior Court. Strashnick responded by filing a counterclaim for reprisal under § 31–44–5, retaliatory conduct under G.L.

**2.** Krzak testified at trial that she still maintained a provision in her rules and regulations incorporated in the lease which required the $140 application fee. Pursuant to § 31–44–7(6)(iv), a mobile home park lease may not contain such a provision.

**3.** Krzak testified that after Strashnick had moved into the park, she retroactively approved of already-built garden sheds that were not in compliance with the prescribed dimensions and approved the building of a gazebo that was noncompliant with the regulations.

1956 § 34–18–46, abuse of process, malicious prosecution, and trespass.

A bench trial was held in the fall of 1998, the outcome of which is now before us on appeal. The trial justice granted Strashnick's motion for a judgment on partial findings because Krzak had failed to comply with § 31–44–2(a), which limits the termination of a mobile home park tenancy to six enumerated circumstances. The justice further ruled that a constitutional attack on § 31–44–2—which Krzak proposed to submit should her eviction claim fail—was not ripe for consideration because the Attorney General had not been notified. Strashnick then proceeded with his counterclaim. The trial justice, after dismissing the claims for abuse of process and for trespass, awarded Strashnick $780 on the reprisal claim, and $920 for compensatory damage and $2,000 for punitive damage on the malicious prosecution claim. Krzak appealed.

## Constitutional Challenge

In her appeal, Krzak argued that the Legislature did not contemplate creating near-permanent mobile home tenancies and that an interpretation of § 31–44–2 that limits eviction only to the six conditions specified therein would violate constitutional property rights. Although she admitted that the Attorney General's office had not been notified before trial, she contended that the Superior Court justice erroneously refused to consider her constitutional challenge. Our review of the trial transcript revealed that Krzak based her claim for eviction "on the basic common law doctrine of holdover tenancy" and that only if the claim was not permitted on that basis, did she intend to pursue a "constitutional argument which we will brief further and submit to the Court upon proper application to the Attorney General." In response, the Superior Court justice decided that without notification of the Attorney General, the constitutional attack was not ripe for consideration.

General Laws 1956 § 9–30–11 provides in pertinent part:

"In any proceeding which involves the validity of a municipal ordinance or franchise, the municipality shall be made a party, and shall be entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard."

Similarly, Rule 24(d) of the Superior Court Rules of Civil Procedure anent intervention by the Attorney General requires:

"When the constitutionality of an act of the legislature is drawn in question in any action to which the state or an officer, agency, or employee thereof is not a party, the party asserting the unconstitutionality of the act shall serve the attorney general with a copy of the proceeding within such time to afford the attorney general an opportunity to intervene." [4]

■ We have addressed this issue repeatedly and have held that when a party "both fail[s] and neglect[s] to comply with its clear obligation when challenging the constitutionality of a state statute to 'serve the attorney general with a copy of the

---

4. Before a September 5, 1995 amendment to Rule 24 of the Superior Court Rules of Civil Procedure, the Attorney General had to be notified "within such time to afford the attorney general an opportunity to intervene," indicating that the Attorney General was an indispensable party. *See, e.g., Griffin v. Ben-* *dick,* 463 A.2d 1340, 1344 (R.I.1983). Notwithstanding cases establishing that intervention is left to the discretion of the Attorney General, notice is still mandatory. *Snicker's, Inc. v. Young,* 574 A.2d 1246, 1247 (R.I.1990) (per curiam).

proceedings,' * * * [w]e do not believe that this Court should undertake to determine the constitutionality of a state statute in a given case without first affording the Attorney General the opportunity to intervene and be heard. *See Crossman v. Erickson,* 570 A.2d 651, 654 (R.I.1990)." *Global Waste Recycling, Inc. v. Mallette,* 762 A.2d 1208, 1214 (R.I.2000). Although on May 14, 1998, Krzak amended her original complaint to include an attack on the constitutionality of § 31–44–2, she failed to give the required notice to the Attorney General, and thus we affirm the trial justice's decision to preclude the constitutional challenge.

▬ In her appeal, Krzak suggested that the constitutionality of § 31–44–2 nevertheless should be considered on the merits, "due to their significance and as exception[ ] to the 'raise or waive' doctrine." The raise-or-waive doctrine and its exception—which Krzak attempted to invoke in her appeal—are not applicable to the present case, but rather the doctrine applies to circumstances in which a party's counsel fails to raise a specific objection to an event or to evidence during trial. *See, e.g., State v. Bettencourt,* 723 A.2d 1101, 1107 (R.I.1999) (holding that issues that were not preserved by a specific objection at trial may not be considered on appeal). Moreover, "[w]e have indicated on more than one occasion that § 9–30–11, as a rule relating to service of process, must be followed and construed strictly." *Brown v. Samiagio,* 521 A.2d 119, 121 (R.I.1987). There is absolutely no evidence that Krzak complied with the statutorily required notification of the Attorney General at any time in the course of these proceedings, including during her appeal to this Court. Consequently, we decline to consider her constitutional challenge here.

## Overview of § 31–44–2 Statutory Provisions

Many states, including Rhode Island, have enacted statutes that set limits on the eviction of mobile home park tenants in consideration of their special circumstances. *See generally* Jay M. Zitter, Annotation, *Validity, Construction, and Application of Mobile Home Eviction Statutes,* 43 A.L.R.5th 705 (1996). Mobile homes present an economic housing alternative, but frequently are restricted to placements in mobile home parks. The resulting shortage of sites for mobile homes and the generally unequal bargaining position of tenants can lead to abuses by the landlord. *Id.* at 719.

This is a case of first impression that examines how the statute applies in a case of an attempted eviction. Although we do not reach the constitutional issue in this appeal, given the landlord's failure to notify the Attorney General, other courts have ruled that restrictions on eviction of mobile home tenants are not unconstitutional. *See, e.g., Palm Beach Mobile Homes, Inc. v. Strong,* 300 So.2d 881, 883–88 (Fla.1974) (holding that limiting the grounds for evicting mobile home tenants was a proper exercise of police power). The Florida Supreme Court explored the question of whether the Florida mobile home statute limiting evictions of mobile home park tenants "constitute[d] an arbitrary and unreasonable regulation by the state constituting a deprivation of property rights without process, impairment of contractual obligation, and a violation of the equal protection clause of the Constitution of Florida." *Id.* at 885. The Court answered the question in the negative and explained:

"We recognize the liberty and property right that every owner of a mobile home and every owner or operator of a mobile home park possesses to use his

property in his own way and for his own purposes subject only to the restraint necessary to secure the public welfare. However, we find that Section 83.271, Florida Statutes, constitutes a reasonable and necessary regulation of that right in view of the peculiar nature and problems presented by mobile homes." *Id.*

Moreover, the Court stated that any constitutional challenge on the grounds that a mobile home park owner was permanently deprived of the use of his land for other purposes than a mobile home park had become moot once the Florida Legislature had enacted into law a section that permitted the eviction of tenants, if a change in use of land was desired. *Id.* at 887. Similarly, pursuant to § 31–44–2(a)(6) of the Rhode Island mobile home act, in case of "[c]ondemnation or change of use of the mobile and manufactured home park," a park owner can evict tenants with proper notice. Subject to one-year notice and the payment of relocation benefits to tenants, a park owner may sell or lease a mobile home park, even if that event results in the discontinuance of the mobile home park. Section 31–44–3.2.

The Vermont Supreme Court noted that "owners *and* renters of mobile homes * * * tend to be lower-income groups that may have difficulty finding alternative housing." *State Agency of Development and Community Affairs v. Bisson,* 161 Vt. 8, 632 A.2d 34, 38 (1993). The Vermont mobile home act, which "added security from arbitrary eviction" by limiting eviction to specific narrow grounds, was held not to violate the takings clause of the United States Constitution because a landlord was not prevented from selling his property. *Id.* at 38–39. The Court further stated that the provision allowing evictions only for cause was "a clear exception to the general landlord and tenant law

of Vermont, which allows evictions without cause in the absence of a written rental agreement." *Id.* at 36. It went on to hold that Vermont's landlord-tenant act and mobile home act were complementary in most instances but when they conflicted, the mobile home act would prevail. *Id.* at 37.

The United States Supreme Court rejected the argument that the interplay between a city mobile home rent control ordinance and California's Mobilehome Residency Law—which limited the bases upon which a park owner may terminate a mobile home owner's tenancy—rendered "the mobile home owner * * * effectively a perpetual tenant of the park, and [that] the increase in the mobile home's value thus represents the right to occupy a pad at below-market rent indefinitely." *Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153, 165 (1992). The Supreme Court reasoned that

"[p]etitioners voluntarily rented their land to mobile home owners. At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice. * * * [T]he state and local laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant. 'This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.'" *Id.* at 527–29, 112 S.Ct. at 1528–29, 118 L.Ed.2d at 165–66.

Under a comparable provision in Rhode Island's mobile home act, a change in the use of a mobile home park is one of the express conditions for which a tenancy may be terminated, subject to proper notice. Section 31–44–2(a)(6) and (b).

In addition, the Supreme Court distinguished the circumstances in *Yee* from a case in which "the statute, on its face or as applied * * * compel[led] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee,* 503 U.S. at 528, 112 S.Ct. at 1529, 118 L.Ed.2d at 166 (citing *Nollan v. California Coastal Commission,* 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677, 686 (1987) (Coastal commission conditioning the grant of a building permit on the grant of a public easement); *FCC v. Florida Power Corp.,* 480 U.S. 245, 251–52, n. 6, 107 S.Ct. 1107, 1111–12, n. 6, 94 L.Ed.2d 282, 289–90, n. 6 (1987) (FCC order limiting rates which utility may charge cable television companies for use of utility poles), and *Fresh Pond Shopping Center, Inc. v. Callahan,* 464 U.S. 875, 877, 104 S.Ct. 218, 219, 78 L.Ed.2d 215, 216 (1983) (Rehnquist, J., dissenting) (requiring the purchaser of rent-controlled apartment housing to obtain permission from the rent control board to remove the property from the rental housing market). Although the Rhode Island mobile home act limits the circumstances under which a tenant can be evicted, a landowner cannot be compelled to use his land as a mobile home park, nor is he precluded from changing the use of his land, if appropriate steps are followed. *See ante.*

Before continuing with our resolution of this case, we briefly review the provisions and purposes of the Rhode Island statute. The Rhode Island Mobile and Manufactured Homes Act (mobile home act), chap-

ter 44 of title 31, was enacted in 1984 with an effective date of July 1, 1985. It defines seventeen significant terms to aid in the interpretation of the chapter, § 31–44–1, and, along with other provisions, sets forth the process of mobile home park licensing, § 31–44–1.7, and provides for triennial surveys by the Department of Health, § 31–44–1.8. The mobile home act establishes notice requirements for the rules and regulations of a park, § 31–44–3, and specifies the necessary procedures to be followed for an eviction of a mobile home park tenant in § 31–44–2, the section at issue in the present case. It further requires a park owner to provide a written lease of no less than one year and prohibits the operator from charging an entrance fee or from providing for one in the lease. Section 31–44–7. Pursuant to § 31–44–17, any owner of a mobile home park or any resident therein may file a complaint with the director of the Department of Business Regulation, whose decision may be appealed to the Superior Court.[5] The statute on the whole affords tenants of mobile home parks more protection than tenants enjoy in other residential housing. For example, pursuant to § 31–44–3.1, a tenants' association has a right of first refusal to purchase before a park may be sold or leased for any purpose that would result in a discontinuance of its use as a mobile home park. As noted previously, in case of a discontinuance due to sale or leasing of a park, tenants are entitled to relocation benefits pursuant to § 31–44–3.2.

Six years after the enactment of the mobile homes act, the Legislature added chapter 44.1 to title 31 of the Rhode Island General Laws, titled "Mobile and Manufactured Home Lot Rental Increases," that included the following declaration of policy:

---

**5.** It appears that neither party has filed a complaint with the director.

"The general assembly finds and declares that the provision of affordable housing is of vital concern to the citizens of the state, that mobile and manufactured homes are an important source for affordable housing, that lot rent increases for these homes are a continuing concern for low and moderate income citizens and the elderly, and that some form of limited regulation relative to lot rental increases for mobile and manufactured homes is in the public interest." Section 31–44.1–1.

The chapter then sets forth notice requirements for rent increases and outlines the procedure for arbitration between a park owner and mobile home owners "[i]f a majority of the mobile home owners of the park believe that the rent increase is clearly excessive." Section 31–44.1–2. Although we do not address the constitutionality of the mobile home act in this appeal because it is not before us, in light of the Legislature's expressed intent to provide special regulations for mobile home park residents, we interpret the act to afford more protection to residents of mobile home parks than is provided to tenants under G.L.1956 chapter 18 of title 34, the Residential Landlord and Tenant Act (landlord-tenant act).

### Eviction under the Act

At the time of the Superior Court proceedings, § 31–44–2(a), titled "Evictions—Termination of tenancy," read as follows:

"After July 1, 1985, a tenancy may be terminated by a park owner or operator pursuant to chapter 18 of title 34, provided, however, that jurisdiction as it relates to this chapter shall be in the district court but subject to one or more of the following reasons and limitations which shall take precedence over any conflicting state statute or local ordinance." [6]

The statute sets forth six specific grounds on which a tenancy may be terminated: (1) nonpayment of rent or charges; (2) the tenant's failure to comply with laws or regulations, subject to notice and opportunity to comply; (3) damage by the tenant to the property; (4) repeated conduct of the tenant which disturbs the peace and quiet of other tenants; (5) the tenant's failure to comply with rules of the park, provided the tenant is afforded an opportunity to comply; and (6) condemnation or change of use of the mobile home park.

Although § 31–44–2(a) refers to the landlord-tenant act, the statute clearly and unambiguously states that eviction of a tenant can only be effectuated if one of the six enumerated conditions applies, conditions that "take[ ] precedence over *any* conflicting state statute or local ordinance." (Emphasis added.) In addition, § 31–44–2(b) specifies that a tenancy may be terminated on thirty days' notice for nonpayment of rent. Termination on one or more of the other grounds requires sixty days' notice.

The circumstances in the instant case exemplify the difficulties encountered by a

---

**6.** This part of the section was subsequently amended to read: "A tenancy may be terminated by a park owner or operator pursuant to chapter 18 of title 34. Jurisdiction in matters relating to this chapter shall be in the district court, but subject to any of the following limitations which takes precedence over any conflicting state statute or local ordinance." Section 31–44–2(a), as amended by P.L.2000, ch.109, § 45, enacted July 7, 2000.

The compiler's omission of the word "reasons" in the 2000 Reenactment of the General Laws was not and, of course, could not represent a substantive change in the Legislature's intent without its consent. In our opinion, no such change in intent is evident. The compiler wisely realized that redundancy is to be avoided. Moreover, any substantive change could be applied only prospectively.

mobile home park tenant when faced with eviction. Krzak testified that the eviction of Strashnick would necessitate removing the mobile home skirting required by the park, detaching his porch, garden shed, and carport, removing his mobile home from the park, and returning the lot to the condition it was before any home had been placed on it. In our opinion, limiting eviction to the circumstances enumerated in § 31–44–2(a) is consistent with the legislative intent of affording special protection to residents of mobile home parks, who often are low and moderate income citizens and the elderly.

■ The statutory reference to the landlord-tenant act is made to specify the procedures to be followed in the District Court, not to bestow on the owner of a mobile home park the ability to evict a tenant for no reason, as a landlord can with a typical residential tenant-at-will. In our opinion, the Legislature did not intend to incorporate into the mobile home act the landlord-tenant act's easier termination of tenancy provisions.

■ We have consistently held that "[i]n carrying out our duty as the final arbiter on questions of statutory construction, '[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.'" *State v. Flores,* 714 A.2d 581, 583 (R.I.1998) (per curiam) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996)). Moreover, "[i]t is our task 'in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes.'" *Dias v. Cinquegrana,* 727 A.2d 198, 199–200 (R.I.1999) (per curiam) (quot-

ing *Brennan v. Kirby,* 529 A.2d 633, 637 (R.I.1987)).

■ Our review of the record of the trial proceedings revealed that Krzak complied with the sixty-days' notice for termination of tenancy specified in § 31–44–2(b) but, as the Superior Court justice noted, in all other respects treated Strashnick "like a month-to-month tenant of any other type of dwelling." Krzak in fact conceded that none of the grounds enumerated in § 31–44–2(a) was at issue in the litigation before us. Instead, she relied "on the basic common law doctrine of holdover tenancy, which basically, allows an owner of real estate to evict an individual after their term is up and upon proper notice." The Superior Court justice rejected this approach, and we agree with her assessment that "[t]here is no question that the plaintiff attempted to evict the defendant in violation of the clear and unambiguous provisions of the statute." Once Krzak had admitted that the conditions of the eviction statute had not been fulfilled, she could not make a claim based on common law that clearly was superseded by the statute enacted in 1985, eight years before Strashnick became a resident at the park.

Krzak's reliance on the landlord-tenant act is equally unavailing, and we concur with the Superior Court justice's finding that the mobile home tenancy dispute in this case fell exclusively within the purview of the mobile home act, without reference to the landlord-tenant act. The Superior Court justice addressed this distinction:

"This statute was enacted in 1985 for the purpose of protecting residents of Mobile Home Parks by treating them differently than other residential tenants for purposes of eviction proceedings.

"It reflected a recognition of the difficulties and expenses involved in relocating a structure such as the defendant's mobile home, from leased land. It re-

flected a recognition of the need for affordable housing in this State and the particular burdens imposed upon an owner of a mobile home if he or she was required to relocate it."

Krzak argued on appeal, as she did in her original complaint, that "§ 32–44–2(a) should not bar evictions for holding over if a tenant does not sign a lease and does not demand one." Although Krzak maintained throughout her appeal that "nothing in the record suggests that tenant ever asked for [a lease]," the evidence clearly contradicted this statement. On cross-examination, Krzak admitted that she offered Strashnick an initial limited lease for a period of four months, in accordance with her convention of having all leases run from January to December 31. Asked whether "at that time, Mr. Strashnick requested that [she] give him a lease of at least one year," Krzak responded: "He can't have it. * * * He wanted to, but he cannot have it." Clearly Krzak violated the statute and deprived Strashnick of the opportunity to obtain the one-year lease to which he was entitled. Krzak's counsel suggested for the first time at oral argument that one-year leases were held available at the mobile home park's office each January. Our thorough review of the transcript revealed that no evidence of this purported fact was submitted to the Superior Court justice, and therefore the issue of whether this would have been sufficient in light of the mandate of § 31–44–7(1)(xiv) that a landlord "[p]rovide a written lease of not less than one year" was not presented to the trial justice. In sum, we hold that unless one or more of the six conditions set forth in § 32–44–2(a) applied, Krzak could not evict Strashnick from the mobile home park without violating the terms of the mobile home act.

## Counterclaims

■ Krzak's remaining issues in this appeal centered on Strashnick's counterclaims for malicious prosecution and reprisal. Krzak contended that "the former claim lacks merit as a matter of law because Krzak had a good-faith belief that she could evict him as a holdover tenant." She further maintained that Strashnick could "not invoke the statutory rebuttable presumption of reprisal because he never demanded a written lease" and that the trial justice "failed * * * to state any facts underlying her conclusion" on reprisal.

■ This Court has previously defined malicious prosecution as "a suit for damages resulting from a prior criminal or civil legal proceeding that was instituted maliciously and without probable cause, and that terminated unsuccessfully for the plaintiff therein." *Clyne v. Doyle*, 740 A.2d 781, 782 (R.I.1999) (per curiam) (quoting *Hillside Associates v. Stravato*, 642 A.2d 664, 667 (R.I.1994)). To establish malice, it must be shown that " 'the person initiating the original action was primarily motivated by ill will or hostility or [regardless of such motivation] did not believe that he or she would succeed in that action,' " *id.* at 783, and that "the prior suit resulted in a special injury to the defendant therein." *Nagy v. McBurney*, 120 R.I. 925, 929 n. 1, 392 A.2d 365, 367 n. 1 (1978).

■ It is well settled that the findings by a trial justice sitting without a jury in a civil case are accorded great weight and will not be disturbed on review "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *Harris v. Town of Lincoln*, 668 A.2d 321, 326 (R.I.1995). Here, the Superior Court justice's findings included her assessment that "the instant action was commenced by [Krzak]

without probable cause and that it terminated unsuccessfully, * * * that the conduct of [Krzak] was malicious[,] [and that her] hostile motive was inferred by the lack of probable cause and also from the evidence." The justice further stated that she had "observed the testimony of [Krzak], the demeanor of [Krzak] when she testified, particularly when cross-examined by [Strashnick's] attorney," and she concluded that "this action was commenced because [Krzak] had great feelings of hostility toward [Strashnick] * * * [a]nd great feelings of frustration at failing to succeed when she attempted to evict him in the past." The trial justice found that Krzak was "primarily motivated by ill will or hostility and did not actually believe that she would succeed with the action * * * and [that] she was seeking possession by harassing [Strashnick] into submission."

Notwithstanding these findings by the trial justice, Strashnick failed to present any evidence that as a result of Krzak's litigation, he had suffered special injury, a requisite element in a claim of malicious prosecution. *Salvadore v. Major Electric & Supply, Inc.*, 469 A.2d 353, 357 (R.I. 1983); *Ring v. Ring*, 102 R.I. 112, 114–15, 228 A.2d 582, 584 (1967). Because Strashnick did not claim any special injury "beyond the trouble, cost, and other consequences normally associated with defending oneself against an unfounded legal charge," *Jacques v. McLaughlin*, 121 R.I. 525, 525, 401 A.2d 430, 431 (1979), the award of $920 for attorney's fees as costs resulting from the malicious prosecution was error. Consequently, we sustain Krzak's appeal on this issue and vacate that part of the trial justice's award.

With respect to punitive damages, this Court has stated that "the question of whether punitive damages are appropriate in a given case is a question of law to be decided by the court, * * * [and] once a court determines that such damages may appropriately be awarded, 'such an award is discretionary with the finder of fact.'" *Callaghan v. Rhode Island Occupational Information Coordinating Committee/Industry Educational Council of Labor*, 704 A.2d 740, 745 (R.I.1997) (quoting *Morin v. Aetna Casualty and Surety Co.*, 478 A.2d 964, 967 (R.I.1984)). Punitive damages are awarded when there is "'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, that * * * ought to be punished.'" *Allen v. Simmons*, 533 A.2d 541, 543 (R.I.1987) (quoting *Morin*, 478 A.2d at 967). Although the Superior Court justice's finding stated that Krzak's conduct in this case rose to the level that warranted punitive damages, her award of $2000 for punitive damages was predicated on Strashnick's claim of malicious prosecution. Because we hold that the claim of malicious prosecution failed in the absence of a special injury to Strashnick, we vacate the punitive damage award as well.

Finally, we address the issue of reprisal, defined in § 31–44–1(14) as "any act taken against a resident which is intended as a penalty for any protected lawful action taken by a resident." Such behavior is prohibited under § 31–44–5(a), which states that "[n]o licensee shall take reprisal(s) against a resident, prospective resident, or association formed pursuant to § 31–44–3.1." Under § 31–44–5(b), if a licensed mobile home park operator takes certain steps against a resident within six months after the resident has taken a protected lawful action, a rebuttable presumption of reprisal arises. Section 31–44–5(c) provides that a resident who has been the subject of a reprisal is entitled to the remedies for retaliatory actions provided in § 34–18–46 of the landlord-tenant act,

including "three (3) months periodic rent or threefold the actual damages sustained by him or her, whichever is greater, and reasonable attorney's fees." Section 34–18–34.

The Superior Court justice found that "the term 'protected lawful action' [was] sufficiently broad as to include [Strashnick's] action in his defending the previous eviction action and in filing the previous, albeit unsuccessful, counterclaim," and she rejected Krzak's narrow definition that attempted to limit "a protected lawful action" to such events as the reporting of a violation of a building or health code. Section 31–44–1(13) defines "protected lawful action" as "any report of a violation of this chapter, or of any applicable building or health code, or any other justified complaint to governmental authority, *or any other justified lawful act* by a resident or prospective resident." (Emphasis added.) Given the extensive protection of tenants' rights in the act and the broadly stated language of the definition, we conclude that a defense of an eviction action or any counterclaim resulting therefrom are clearly among those lawful actions contemplated by the Legislature. *See Commercial Union Insurance Co. v. Pelchat,* 727 A.2d 676, 681 (R.I.1999) (holding that statutory provisions are examined in their entirety and in contemplation of the Legislature's intent).

In her decision, the Superior Court justice found that within six months of proceedings in District Court—in which Strashnick successfully fought an eviction and was permitted to cure park rule violations—Krzak attempted to evict Strashnick yet again. Without making a finding on whether Strashnick had the benefit of the presumption under the act, the Superior Court justice found that "the facts and reasonable inference from those facts are so clear, that [Strashnick] has sustained

* * * his burden of proof on the question of reprisal." Krzak contended on appeal that the Superior Court justice failed to state any facts underlying her conclusion that Krzak intended to evict Strashnick as a penalty for his defense of a prior eviction action. As we have explained, a trial justice's findings on mixed questions of law and fact are generally entitled to the same deference as the justice's findings of fact. *Hawkins v. Town of Foster,* 708 A.2d 178, 182 (R.I.1998). In her decision, the Superior Court justice concluded that Krzak "commenced an action for possession, and it is clear that possession is exactly what she wanted to accomplish." Moreover, the justice commented in detail on Krzak's attempts to "evict [Strashnick] for a lengthy period of time" and noted that Strashnick "has apparently been a thorn in the side of [Krzak] for several years." In light of the Superior Court justice's finding that Krzak's objective in this litigation was to rid herself of Strashnick, and absent any finding that the eviction proceedings initiated by Krzak were primarily "intended as a penalty," the judgment for Strashnick on the claim of reprisal was error. Consequently, we vacate the award of $780.

## Conclusion

For the foregoing reasons, the appeal is denied in part and sustained in part. We affirm the Superior Court judgment denying Strashnick's eviction, reverse the judgment on the counterclaims, and vacate the compensatory and punitive damages awards for malicious prosecution and reprisal. The case is remanded to the Superior Court with our direction to enter judgment consistent with this opinion.

FLANDERS, Justice, dissenting and concurring.

I respectfully disagree with that portion of the majority's opinion that construes

legislation regulating mobile and manufactured home parks, G.L.1956 chapter 44 of title 31 (the act), as preventing the owners of such parks from terminating a periodic tenancy therein, and from commencing an eviction action to regain possession of the premises, unless the owner demonstrates that its reasons for doing so fall within one of the enumerated "limitations" in § 31–44–2(a). The majority's interpretation of § 31–44–2(a) precludes mobile-home park owners from terminating tenants for non-renewal of their leases or for any other lawful reasons unless the reasons fall within one of the statute's six "limitations." But one searches in vain for any language in that statute to support such a construction. Contrary to the majority, I can discern no clear or unambiguous language in the statute indicating that the Legislature ever intended such a result.

I also respectfully disagree with the majority's decision to enforce the earlier-enacted Public Laws version of § 31–44–2(a) (P.L.2000, ch. 109, § 45 enacted July 7, 2000) over the version contained in the 2000 Reenactment of the General Laws (effective per G.L.1956 § 43–4–18(d) "on and after December 31 of the calendar year of their reenactment"). The current version of § 31–44–2(a) includes "the changes made by the 2000 Reenactment of this title which were not included in the 2000 amendment." *See* § 31–44–2 compiler's note. These changes to the earlier version of § 31–44–2(a) were not included in the 2000 amendment to that statute as set forth in P.L.2000, ch. 109, § 45.

Note that one of the changes in wording to the statute is that the 2000 Reenactment dropped the statute's reference to "reasons," leaving only the word "limitations" to describe the six enumerated subparagraphs in the statute. The compiler ("office of law revision") is specifically authorized by G.L.1956 § 43–4–18(a)

"to reenact annually specific titles of the general laws which shall be amendatory to the general laws of Rhode Island, 1956, as amended, for the purposes specified in § 22–11–3.4. Substantive changes contained in the reenactment of these titles shall be brought to the attention of the general assembly annually in a 'Statutes and Statutory Construction' bill, prepared by the law revision office, for general assembly approval or disapproval."

In addition to authorizing such changes, G.L.1956 § 22–11–3.4 requires that the compiler

"shall rearrange, rephrase, and consolidate the public laws and acts and resolves of the general assembly so that redundancies may be avoided, obsolete enactments eliminated, contradictions reconciled, omissions supplied, and imperfections cured. The law revision director has no authority either to change the law or to alter the substance of the statutes but shall alert the general assembly annually to specific changes which may be required."

The changes in the present version of § 31–44–2(a) were part of the 2000 Reenactment, but they were not included in any " 'Statutes and Statutory Construction' bill." Apparently, they were not considered substantive in nature because they merely "rearrange[d], rephrase[d], and consolidate[d]" the language to clarify the original intent of the General Assembly. Therefore, because these changes in the 2000 Reenactment of § 31–44–2(a) do not conflict with any version of the act passed by the General Assembly, *see* § 43–4–18(c) (stating that acts passed by the General Assembly control over conflicting amendments that are part of reenactments), I believe that this version of the statute should be enforced as the law in effect at the time we decide this case. *See Solas v.*

*Emergency Hiring Council of the State of Rhode Island,* 774 A.2d 820, 826 (R.I.2001) ("[T]his Court has traditionally applied the law in effect at the time we consider an appeal."). Moreover, we have held that, in cases like this one, if a statutory change is non-substantive, remedial, or procedural, then we apply the law in effect at the time of the appeal rather than at the time the cause of action arose. *See, e.g., Dunbar v. Tammelleo,* 673 A.2d 1063, 1067 (R.I.1996).

Although § 31–44–2(a) enumerates six "limitations" with reference to the termination of a mobile-home tenancy, any one of which "takes precedence over any conflicting state statute or local ordinance" (emphasis added), there is no indication in § 31–44–2 or elsewhere that the Legislature intended that the enumerated limitations in § 31–44–2(a) would constitute the exclusive and only grounds for a mobile-home-park owner or operator to terminate a tenancy. In any event, it certainly failed to use any language that clearly and unambiguously so provides.

I reach this conclusion for several reasons. First, none of the enumerated "limitations" in § 31–44–2(a) conflict with the express provisions of G.L.1956 § 34–18–37 (allowing termination of periodic tenancies), provisions that are expressly incorporated by reference into § 31–44–2(a). These provisions allow an owner or landlord to terminate a periodic residential tenancy by providing the tenant with the requisite advance written notice of such termination. Thus, § 31–44–2(a) expressly provides, in its first sentence, that "[a] tenancy may be terminated by a park owner or operator pursuant to chapter 18 of title 34 [the Residential Landlord and Tenant Act]." Section 34–18–37(b) of that act expressly allows landlords to terminate periodic tenancies like this one upon provid-ing the tenant with proper advance notice. Hence, the specific legislation dealing with the termination of tenancies in mobile and manufactured home parks expressly incorporates by reference the provisions of the Residential Landlord and Tenant Act. These landlord-tenant-act provisions allow for nonrenewals, for terminations of periodic tenancies, and for evictions of tenants who unlawfully hold over after the lawful termination or expiration of their tenancy.

Second, the enumerated limitations in § 31–44–2(a) take precedence only over any conflicting state statute or local ordinance. But allowing nonrenewals, terminations of periodic tenancies, and evictions for unlawfully holding over after terminations occur in no way conflicts with any of the enumerated other "limitations" in § 31–44–2 for terminating mobile-home-park tenancies.

Third, conspicuously absent from § 31–44–2(a) is any language or other indication that the enumerated "limitations" set forth therein were intended to constitute the exclusive or only bases for terminating a mobile-home-park tenancy. *Compare, e.g.,* Fla.Stat .Ann. § 723.061(1) (West 2001) ("A mobile home park owner may evict a mobile home owner or a mobile home only on one or more of the grounds provided in this section."). It is one thing for the General Assembly to specify that such provisions take precedence over any conflicting state statute or local ordinance, but it is quite another for the Legislature to require that the "limitations" constitute the exclusive grounds for terminating a mobile-home-park tenancy. Here, the General Assembly provided for the former but not for the latter. Because the General Assembly has included no language in the statute evincing an intention to change or to override the otherwise applicable common and statutory law of this state allowing termination of residential tenan-

cies on other lawful grounds, I do not believe we should construe § 31–44–2(a) to do so. Indeed, the statute in question (§ 31–44–2(a)) fails to include any language from which one could even infer an exclusivity provision, much less does it clearly and unambiguously so provide by its express terms.

Fourth, under conventional rules of statutory interpretation, "when apparently inconsistent statutory provisions are questioned, every attempt should be made to construe and apply them so as to avoid the inconsistency * * *." *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987). Thus, "[w]herever a general provision shall be in conflict with a special provision relating to the same or to a similar subject, the two (2) provisions shall be construed, if possible, so that effect may be given to both * * *." G.L.1956 § 43–3–26. Accordingly, I would hold that only when a provision of the Residential Landlord and Tenant Act expressly conflicts with a provision of the more specific legislation addressing mobile and manufactured home parks would the latter take precedence, but only if effect cannot be given to both provisions. But nowhere in the latter act is there any conflict with those sections of the Residential Landlord and Tenant Act that allow for termination of periodic tenancies and for evictions of tenants who unlawfully hold over after such terminations. Indeed, § 31–44–2(b) seems to expressly contemplate such terminations when it provides for a minimum period of "not less than sixty (60) days" for a tenant to be notified "to remove from the premises." This specific provision would take precedence over the conflicting portion of § 34–18–37(b), which allows a landlord to "terminate a month-to-month tenancy or any periodic tenancy for more than a month or less than a year by a written notice" that is delivered to the tenant "at least thirty (30) days before the date specified in the no-

tice." But it would not prohibit a mobile-home-park owner from terminating a periodic tenancy for a reason other than one enumerated in § 31–44–2(a). Thus, while the Act provides mobile-home tenants with greater protection from nonrenewals and terminations of periodic tenancies than other tenants enjoy, it does not go so far as to preclude such terminations except for one of the six "limitations" listed in § 31–44–2(a). This reading construes the two provisions "so that effect may be given to both." Section 43–3–26.

Fifth, if periodic tenancies could not be terminated at the conclusion of the term except upon one of the "limitations" stated in § 31–44–2(a), then the Legislature's provision for a mandatory "written lease of not less than one year unless the resident requests in writing a shorter term, or unless a resident in writing states that he or she does not desire a written lease," § 31–44–7(1)(xiv), becomes virtually meaningless. *See Brennan*, 529 A.2d at 637 (holding that "[a] statute or enactment may not be construed in a way * * * if at all possible, to render sentences, clauses, or words surplusage"). After all, if a tenant cannot be terminated by the mobile-home-park owner at the conclusion of the lease term unless the termination complies with one of the six enumerated "limitations" specified in § 31–44–2(a), then the required minimum one-year-lease term becomes largely superfluous because the tenant cannot be terminated in any event unless the owner complies with one of the six reasons listed in the statute. Given the mandatory notice provisions for raising the tenant's rent and for terminating any tenancy, what would be the legislative purpose for mandating term leases of one year or longer if the owner could not terminate the lease in any event during or at the expiration thereof absent compliance

with one of the enumerated "limitations" set forth in § 31–44–2(a)?

I note also that, pursuant to § 31–44–5(b), park owners and operators are forbidden from taking reprisals against their resident tenants for having engaged in "any protected lawful action." Moreover, "[a]n increase in rent, *nonrenewal of lease*, refusal to offer a lease, or *termination of tenancy*, taken by a [landlord] against a resident * * * within six (6) months after the resident * * * has taken any protected lawful action, creates a rebuttable presumption that the act by the [landlord] is a reprisal." *Id.* (Emphasis added.) And a "[r]eprisal may be pleaded as a defense in any court proceeding brought against a resident or prospective resident after he or she has taken any protected lawful action." *Id.* But if an owner of a mobile-home park could not terminate a periodic tenancy or refuse to renew a lease except for one of the six "limitations" set forth in § 31–44–2(a), then the above-referenced provisions in § 31–44–5(b) prohibiting "nonrenewal of lease" and "termination of tenancy" as a reprisal for a tenant taking any protected lawful action would appear to be unnecessary. If the majority's interpretation were correct, then the owner could not terminate or fail to renew such an expired or holdover tenancy in any event—irrespective of whether the termination constituted a reprisal—unless the grounds for doing so fell within one of the "limitations" set forth in § 31–44–2(a).

Thus, it seems to me that the more coherent interpretation of all language in this act—and the General Assembly's presumed but unexpressed intent—is that a mobile-home-park owner may refuse to renew a lease or terminate a periodic tenancy for any lawful reason, as long as, in doing so, the tenant receives the requisite advance written notice as provided for in § 31–44–2(b) (sixty days) and as long as

such action does not amount to a reprisal against a tenant for having taken a protected lawful action. But if the reason for the termination implicates any one of the "limitations" set forth in § 31–44–2(a), then those "limitations" take precedence over any conflicting provisions of any other law or contractual provision, and the owner must comply with their terms if the termination is for one of those six enumerated reasons. Such an interpretation gives effect to all provisions of the act, and gives precedence to any provisions in the act that conflict with the provisions of the Residential Landlord and Tenant Act. Yet, at the same time, it respects the Legislature's apparent decision to allow owners to terminate periodic mobile-home-park tenancies and not to renew leases at their expiration as provided for in that latter act, as long as such conduct does not constitute a reprisal for the tenant's taking a protected action.

This interpretation also avoids converting mobile-home-park residents into *de facto* permanent tenants. For that is the practical effect of limiting a park owner's reasons for termination to those enumerated in § 31–44–2(a). Under the majority's interpretation, unless a tenant fails to pay rent, fails to comply with applicable law, fails to adhere to rules and regulations relating to mobile and manufactured home parks, or unless the tenant fails to comply with one of the other "limitations" in § 31–44–2(a), the tenant has a right to remain in the park as a tenant for the indefinite future and cannot be terminated for any other reason. Although, as the majority suggests, such an incursion into an owner's property rights may well survive federal constitutional scrutiny in a case that properly raises such a challenge, our state constitution could be construed to raise a higher bar than its federal counterpart to uncompensated takings of private property. In any event, because of the radical

nature of creating such quasi-permanent tenancies against the will of park owners, I would require a much clearer statement from the Legislature before I would ascribe such a potentially confiscatory purpose to the framers of this legislation—especially when the act as drafted is already chock full of anti-reprisal measures and other extraordinary protections for mobile-home tenants against arbitrary terminations—without taking the unwarranted step of judicially grafting onto it an exclusivity provision that the text of the statute simply cannot support. *See Brennan*, 529 A.2d at 637 (holding that "in interpreting a legislative enactment * * * the court must attempt to ascertain the [legislative] intent by considering the enactment in its entirety and by viewing it in light of circumstances and purposes that motivated its passage. * * * A statute or enactment may not be construed in a way that would attribute to the Legislature an intent that would result in absurdities or would defeat the underlying purpose of the enactment. * * * Moreover, we have indicated that when apparently inconsistent statutory provisions are questioned, every attempt should be made to construe and apply them so as to avoid the inconsistency and should not be applied literally if to do so would produce patently absurd or unreasonable results.").

Although the act contains no statement or other indication that the "limitations" enumerated in § 31–44–2(a) were intended to constitute the exclusive or only grounds for terminating a mobile-home-park tenancy, the majority, nevertheless, decrees this to be so, apparently believing that mobile-home-park tenants deserve even greater protections beyond those express additional safeguards that the General Assembly has afforded to mobile home tenants in the act. But even if I were to concede, arguendo, that as a policy matter, mobile-home-park tenants deserve even greater

protections from terminations and evictions than the act currently provides—and the act certainly gives them much greater protections than other residential tenants presently enjoy—I do not believe that a mere judicial belief in the righteousness of this policy is enough of a warrant for this Court to legislate the extent and degree of what those heightened protections should be. I believe the General Assembly has specified the additional protections that it desired to extend to such tenants in enacting chapter 44 of title 31. Although clearly providing mobile-home-park tenants with greater protections than conventional residential tenants, the General Assembly neglected to go so far as to prevent them from suffering a termination at the end of a periodic tenancy—as long as that termination does not constitute a reprisal for the tenant's taking a protected action, as long as the owner complies with the "limitations" of § 31–44–2(a) (if the termination implicates any of the six "limitations" listed therein), and as long as the tenant receives the requisite sixty-days-advance-written notice. Thus, I would not construe § 31–44–2(a) as providing that mobile-home-park tenants can be terminated only for one of the six enumerated "limitations" set forth in that statute—at least when the Legislature, in its wisdom, declined to go this far in its framing of that law.

In other respects, I concur in the results of the Court's opinion. Thus, I would reverse the Superior Court and vacate the judgment in its entirety.